For today's last argument, Appeal Number 23-1058, SmartSky Networks v. Gogo Business Aviation. May it please the Court. SmartSky filed this appeal to stop the irreparable harm that Gogo's infringement is causing to SmartSky. The District Court made multiple legal and factual errors in finding that SmartSky failed to show likelihood of success on the merits and irreparable harm. The merits issues are dominated by questions of claim construction, which this Court reviews with no deference to the lower court's findings. These are preliminary constructions, right? Tentative constructions being done at this preliminary injunction phase. So, as I understand our case law, we don't require a true Markman-style definitive claim construction by the District Court to decide a preliminary injunction. Is that right? That's correct, Your Honor. The constructions that the Court performs at the preliminary injunction stage are not and don't necessarily need to be conclusive and those can change later in the case. However, they still are subject to review by this Court in compliance with standard doctrines of claim construction. Has there been a Markman hearing yet? No, Your Honor. Okay. All right, go ahead. Regarding irreparable harm, the District Court made factual errors and disregarded multiple facts that this Court has repeatedly found establish irreparable harm. In my limited time today, I'd like to focus with respect to the merits on two issues. First, the District Court's improper narrowing of the 947 and 417 patent claims to only cover soft handoffs and excluding hard handoffs. And second, with respect to the 717 patent, the District Court's narrowing of those claims to require a first base station that employs solely unlicensed spectrum and a second base station that employs solely licensed spectrum. Regarding irreparable harm, I'd like to focus on the District Court's errors with respect to the imminence of the harm that SmartSky is facing, price erosion, reputational harm, and whether the harm is quantifiable. Turning first to the 947 and 417 patents, the District Court's construction narrowing those claims to only soft handoffs is inconsistent with multiple embodiments in the specification. Specification explains... I take you out of order. I apologize for that. But did SmartSky's expert admit that any lost sales would be quantifiable through trial? Do you agree? I do not agree, Your Honor. That is on appendix pages 295 and 296, and then he further expounded on it in a second rebuttal declaration at appendix 8112 through 8121, where Mr. Cook, SmartSky's economic expert, said the majority of these damages are not quantifiable at trial. And he explained the reason for that. He said there's actually multiple reasons. First, there are a number of customers where it's unknown that may be waiting to decide now that they have two options, whereas SmartSky would be the only option if it weren't for GoGo's 5G in terms of upgrading to the improved performance of the ATG network. What about at 6922-23, where the question went, do you agree that a portion of SmartSky's lost sales and lost profits can in fact be quantified as damages throughout the time of trial? Answer, yes, I indicate that specifically in my declaration. Yes, that's a portion of it. You can always count sales and multiply the number of units sold by revenue per unit. However, there's a time component to this as well, as what Mr. Cook explained, where he said, even if there's infringement found and there's a permanent injunction at the end of the trial... I guess it says here the specific portion that you agree is quantifiable is lost sales and service revenue through the date of trial, correct? Answer, yes. So, I don't know. It seems like he's saying lost sales and service revenue is quantifiable through the date of trial. In a declaration that he submitted after that deposition, and this is on Appendix 8116, he explains that even during this interim period through trial, there's an unknown number of customers that may be holding out and determining which one they're going to decide on, as well as customers that have selected GoGo in this interim period that may have selected SmartSky if it weren't for the option of GoGo 5G. And when that decision would have been made is indeterminable. And the time factor is a key component here because there's not just the equipment revenue, there's the monthly subscription revenue. So, when those customers sign up for SmartSky, that affects the total revenue. And that's the part that's indeterminable and that Mr. Cook explained in his declaration. Do you have a trial date yet? It is in 2025. I believe it's spring or summer of 2025. Turning back to the 947 and 417 patents, the district court's construction is inconsistent with multiple embodiments in the specification. The specification explains that there are two standards that can be used, the 802.16 standard and the LTE standard. And the specification explains that the data communications link is maintained continuous and uninterrupted using those standards. SmartSky's technical expert, Dr. Goldberg, explained that both of those standards require hard handoffs. So, the district court's construction limiting the claims to only soft handoffs is inconsistent with multiple embodiments. The same is true for the dependent claims. The district court's construction violates claim differentiation because claim four recites that the data communications link is maintained continuous and uninterrupted according to LTE. The claim says maintained continuous and uninterrupted in time. I'm just wondering what work do you think the phrase in time is doing in the claim? Your Honor, I think it's focusing on the data communications link generally, which Dr. Goldberg, SmartSky's technical expert, explains includes multiple layers, and we're not focusing just on the physical layer. So, I'm not sure I have a definitive answer to your question on what specifically in time means. To me, it suggests it's forcing a certain understanding of the continuity of the link to not be referencing what a user might be experiencing, but something more on a technical level as to whether is there any point in time that the link is not interrupted. Correct, Your Honor, and I guess the question then is, are we talking about the physical layer or the data communications link? Now, Gogo's position is focusing on the physical layer, and that's the difference between a soft handoff and a hard handoff, but the claim is written more broadly and focused on the data communications link, which encompasses multiple layers. Right, I know you're saying 802.16 encompasses using hard handoffs, right? Yes, Your Honor, not only... The other side makes reference to something in column three of the 947, which talks about how there might be technology adaptations to achieve connectivity with an aircraft in flight. And then column nine, the lower half of it, starting at line 41, seems to be talking about a modified version of 802.16 will include extra protocols and code that are not part of 802.16 in order to have an effective communication continuous and uninterrupted in time with aircraft at jet speed. So I guess what I'm wondering is, is the specification itself contemplating that the use of 802.16 WIMAX is not necessarily the normal default version of it, but it's going to need to be some kind of modified version of it with new protocols and code added in in order to make this thing work with communication with a moving jet plane? Well, Your Honor, 802.16 E standard is a very large standard. It has many options that can be used or not used, but as Dr. Goldberg explained, and he pointed to multiple references in the appendix, it's page 9136 where it says hard handoffs are required. And so while there are many options that could be used when implementing 802.16, the hard handoffs are a requirement. And so these other portions of the specification that reference other adaptations that may be made, our position is that it still doesn't change the fact that hard handoffs are required in the standard, and that's how one of ordinary skill in the art would understand the specification. The second issue I'd like to move on to on the merits is the district court's improper narrowing of the claims to solely using unlicensed spectrum in one base station and solely using licensed spectrum in the other base station. In the district court, the only justifications provided were that the plain language of the claim requires the word solely to be inserted. I'm just curious, for this claim 1 in the 717 patent, what would you say is the point of novelty in this claim? Well, it's a combination, Your Honor. Because other than the first base station employing unlicensed spectrum and the second base station employing licensed spectrum, everything else in this claim looks pretty basic. About, you know, two base stations communicating with an aircraft and then doing a handover between the two base stations as you move from one coverage area to the other. And then anything that looks potentially distinctive is the idea of one base station using licensed spectrum and the other base station using unlicensed spectrum. Am I missing something about this claim? Yes, Your Honor. The difference is that in the prior art, the base stations oriented their radiation patterns up in the upward direction. So in this claim, the difference is you orient the radiation pattern toward the horizon. The reason this is significant is because you have a plane that is located further away from the base station. So by orienting it toward the horizon, the plane can communicate with a base station that is more distant. And the reason that's significant is because you can use unlicensed spectrum. Because unlicensed communications that are going on below the aircraft are not going to be a problem because the aircraft is not looking down. It's looking out toward the horizon. And so that's the key benefit is that you can use unlicensed spectrum as opposed to licensed spectrum. If we go with your construction of these two limitations, does that mean these limitations are really doing no work in the claim? Because the first base station can employ unlicensed or licensed spectrum, and the second base station can employ licensed or unlicensed spectrum. No, Your Honor. The first base station still must employ unlicensed spectrum. So if there's a base station that employs only licensed spectrum, that cannot read on the first base station. And the opposite is true for the second base station. It has to employ at least licensed spectrum. So any base station that employs only unlicensed spectrum would not meet that limitation. So there still is a distinction there. It doesn't require both base stations to use both licensed and unlicensed, but it does cover that scenario. And that's our position on the construction of those terms. Two questions before you may want to save some rebuttal time. Do you agree that Advance L5 is non-infringing? Advance L5 is a necessary component to the infringing the accused product, the GOGO 5G. And GOGO has said repeatedly that the Advance L5, the reason that its sales are so good is because of that upgradeability option to GOGO 5G. So our position is that it is a component of the infringing product, yes. And has this GOGO 5G network been released? Let me just make sure I understand exactly where we stand. Yes, thank you, Your Honor. I was going to get to that point. That's an error that the district court made, is found that the harm to SmartSky is not imminent because the 5G network has not yet been released. But whether customers have actually started using it or not, which they haven't, that that's expected later this year, is not the relevant question. The question is there are sales that have been made in their latest SEC plans. Did you just answer my question, though? Has it been released? Can you start there? It hasn't. Customers are not actively using it yet. The network is complete. There is a delay in the chip set that goes on the plane. So customers are not actually using it yet. That means it's not been released? I feel like I'm struggling here. I'm starting to understand the word released. It's not being actively used by customers yet, but they are selling subscriptions and installing them. Because they don't have the chip set needed yet, right? Correct. There's a delay. There's nobody anywhere that you know that today can actually do all the steps of any of these claims. Is that right? Well, GoGo is offering to sell and has sold the system that performs these steps. So that's the act of infringement. And because those customers, once they sign up, with the average lifespan of 17 years, those customers are now gone for essentially two decades. And so that's the key point of the irreparable harm, that those customers are now off the table, regardless of whether they're actually using the 5G network yet or not. Okay. We'll restore some amount of time. Thank you. The other side. Thanks. May it please the Court, Nathaniel Love for GoGo. I'd like to actually start with the statements about irreparable harm at the beginning of counsel's discussion. The holdout theory that was articulated, counsel referenced timing as to certain customer purchases. To be clear, the Court is absolutely correct that Mr. Cook conceded that for lost sales and service revenues up to the time of trial, that is quantifiable. It's something they could attempt to recover as damages. The holdout theory that's articulated came only in his reply declaration. It wasn't part of the motion. It wasn't a theory of irreparable harm that was articulated as a basis to grant this extraordinary relief. So it can be dismissed for that reason alone. But it's also entirely based on speculation, that the idea was even if they prevailed at trial and there were a permanent injunction, some customers might be slow to switch and they were uncertain as to the timing of what that might be. And that is something that is far off in time in the kind of speculative harm that this Court has not found sufficient to support this relief. With that, I'll turn to the question on the 947 and 417 patents and the continuous and uninterrupted in time. I want to step back to make sure it's clear how we even get to a claim construction question. Smart Sky's motion articulated a theory that make-before-break soft handovers were what was covered by these claims and that GOGO infringed because GOGO's system would use that type of handover. That was their motion. That assumption about GOGO's system, as it turns out, was wrong. And so GOGO pointed out in its opposition that GOGO would not perform make-before-break handovers. And so with that, they have to carry a burden of proof showing a likelihood of success on the merits and they didn't do it. This claim construction issue only arises because, in reply, they took a very different view of the claims and said, well, actually, we cover all kinds of handoffs, make-before-break and these hard handoffs, the break-before-make. And the District Court entertained that argument? The District Court did entertain that argument and that's why it reached it. So you're not arguing some kind of waiver or forfeiture to us, are you? I'm not, Your Honor. I'm simply saying that the failure of the motion itself to carry their burden of proof would be a reason for this Court to affirm because it can do so on any basis of the record without actually reaching the claim construction question. But I'm happy to reach it. We're already passed on this, so we are where we are. Certainly, and happy to reach it, Your Honor. So as far as the claim construction that the District Court reached, you're right that it's preliminary and it's based on the record that was provided in this fashion where it was raised for the first time only in the second half of the briefing. The key really is what the inventor said and how the inventor characterized their invention and that's something that counsel didn't address. That's the intrinsic evidence that's really most persuasive. The claim language itself, as you recognize, continuous and uninterrupted in time certainly suggests no interruption. But then you go and look at the declaration that the inventor put in, which is at Appendix 6801, characterizing what was actually conceived and how what he conceived accomplished continuous and uninterrupted in time. And at 6802, there's actually a claim chart that the inventor provided and there's a claim chart linking continuous and uninterrupted in time to two exhibits that he attached. So in the chart at 6802, corresponding to continuous and uninterrupted in time, he references a letter, the sixth paragraph of Exhibit A, which describes a seamless handoff from one tower to the next, responsive to the plane being connected to two towers at the same time. So that simultaneous connection of a plane between two towers, that's a soft handoff. He goes on in his claim chart to say, Exhibit B shows adjacent stations in simultaneous communication with the same plane. The coverage areas overlap so the seamless handoff occurs as the plane travels between them. And the letter and the figure that are being referenced in this declaration are at 6808. That's the letter that says every plane is connected to two pencil beams, allowing for a seamless handoff from one tower to the next. And the figure... Where are you right now? I am, I apologize. I'm moving too quickly, Your Honor. So 6802 is the claim chart. And the claim chart references an Exhibit A, which is found at 6808. The claim chart points the reader to the sixth paragraph, which is the second to last paragraph of Exhibit A. And in the middle of that paragraph, the inventor writes, Also note, every plane is connected to two pencil beams, allowing for a seamless handoff from one tower to the next. So that's the soft handoff. And then Exhibit B, there is a figure. And it's found at 6810. There's a slightly clearer picture at 6838. And it's just an image that shows, consistent with the description, that there are simultaneous connections between a plane and two towers. So there is no point in time where the aircraft is not connected to at least one tower. That's the intrinsic evidence that really bears on the construction of this. Everything else they're pointing to is largely extrinsic evidence. The only argument they make based on the patent is about these standards, about 80216 and about LTE. And as the court, Judge Chen, you rightly recognized, the specification contemplates that those standards may need to be modified, including in Column 9, as you highlighted, possibly with respect to this claim limitation. You didn't refer to Column 9 in your brief. I was curious why you didn't. What we did refer to, Your Honor, is in Appendix 41 and 42, those earlier columns which mentioned modifications. You're right, Column 9 was not actually cited in our brief. I'd have to go back and check to see if it was in the district court papers. But the point that's made on Appendix 41 to 42, I believe that's Columns 2 and 3, is that the standards may need to be modified. There's nothing in the specification that discusses handover in these standards at all. As counsel conceded, these standards, technical standards, are thousands, potentially pages of documents covering all aspects of the standard. There's nothing in the patent that specifically highlights, of course we will accomplish handover in exactly the same way with no modification. There's nothing like that at all. But we all agree 608.12 covers hard handoffs. The standard as described, there's not a debate over whether the standard, LTE standard or the 802.16 standard, describes hard handoffs. The question is whether by mentioning that the invention can be implemented in the setting of those standards, also mentioning that the standards may need to be modified in order to do so, without explaining what modifications might be necessary, that somehow creates an exclusion of embodiments or a claim differentiation problem. It doesn't because there's nothing said in the patents about whether or not the modifications would include or not include a need to modify the handover procedures. Certainly that vagueness can't overcome the very clear statements that the inventor made about how continuous and uninterrupted in time would be accomplished in his invention. I'd like to move to the 717 if there are no more questions on continuous and uninterrupted. To the point about the point of novelty, the articulation just now was that orienting antennas toward the horizon was the point of novelty. That particular issue didn't come up in the briefing, but if you look at Appendix 4673, the prosecution history of one of the other patents, there's a prior art reference with disclosing that same claim limitation. If that's the point of novelty, that's found in the prior art. To your questions, Judge Chen, under the interpretation of this patent that they're articulating at this stage, these limitations about the licensed spectrum and unlicensed spectrum, as used between the two base stations, really don't do anything. They don't serve any purpose. This has been a moving target as to what actually their interpretation of these claims is. Initially, their view seemed to be... Normally, if the limitations that a base station employs licensed spectrum, that limitation doesn't necessarily now all of a sudden exclude the ability for that base station to employ unlicensed spectrum, does it? In isolation, Your Honor, I agree. But it's not in isolation. The limitation just... We know that that base station must, among possible other things, use licensed spectrum. That's correct. In the context of reading the claim, the claim says there's a first base station using unlicensed, there's a second base station using licensed, and then it goes on further to describe an interaction between those systems. An aircraft travels from the coverage area of one to the coverage area of the second, and there's a handover between them. In the context of reading that, what the district court understood the claim to mean, and what a person of ordinary skill reading the claim would understand is, you're talking about a handover between the unlicensed spectrum, and the first base station it's using, to the licensed spectrum, so a cross-network or a cross-spectrum handover. The articulation of infringement in the motion, and in the expert declaration that accompanied it, was that GOGO's network would operate in that way, and there would be these cross-network handovers. Again, that's an assumption that turned out to be wrong, and so they shifted to a new theory of what these claims might mean in their reply brief in the district court. We're reaching this claim construction issue in the same way that we did in the other ones. In GOGO's 5G network, are those base stations capable of doing a handover between an unlicensed spectrum and a licensed spectrum? No. There is a declaration from Mr. Liu, who is GOGO's engineer. I'm not asking whether it's intended to be used that way. I'm just wondering, structurally, as configured, are they even capable of it? I think that question is... Honestly, I'm not quite certain I can answer that question, certainly not based on this record. The way the base stations are set up, and what Mr. Liu is describing, there are no such cross-network handovers. The systems in GOGO's 5G network, as Mr. Liu describes them, are effectively operating in parallel. As the plane is traveling across the country, there is a radio that can communicate with the base stations on the ground, which operate in licensed spectrum, and there is a separate radio on the plane that can communicate with the base stations on the ground that are using... I forget if I started with licensed or unlicensed. The other type of spectrum. When it travels between these coverage areas, each of those radios, as necessary, engages in handovers solely on the slice of spectrum that they're using, with the base stations that use that spectrum. There's never any crossing over between those radios. They simply change over when they need to as they travel between the coverage areas. There's effectively computers and software on the plane that then are deciding, with respect to network traffic coming from the aircraft to the ground, which of those networks to use, based on what the conditions are and what speeds are currently being supported. That's how the system operates. It just does not operate in the way that's described in the claims. It doesn't operate the way they articulated in their motion, and that's why the district court found they failed to carry their burden of proof. In order for you to prevail, we just have to agree on a more likelihood of success, is that right? That's correct, Your Honor. Yes. Either one would be a basis to affirm, so even if there were questions about the preliminary claim constructions, as I've argued, there's actually no need to reach them, but there's certainly not, because you can affirm irreparable harm alone. If there are no further questions about any of these issues, we'd rest on our briefs on the remaining points. Thank you. Let's hear from the appellant for two minutes. Thank you, Your Honor. May it please the Court, I'd like to address a couple of points here. First, with respect to the prosecution history, where the inventor submitted a declaration showing soft handoffs as an example of the continuous and uninterrupted limitation. As we explained in our briefs, that's not the clear disavow that Gogo is arguing for here. He submitted a declaration showing an example of a continuous and uninterrupted data communications link, and the examiner had cited a prior art reference that showed a soft handoff, and so that's why the inventor submitted a declaration showing that too. That doesn't mean that the data communications link is limited only to soft handoffs. It's one example, and so that's why it's not a limiting disclaimer or disavow, which is a very high burden. It's not met here. Secondly, with respect to irreparable harm and whether Mr. Cook conceded that sales are quantifiable, Mr. Cook also explained that there's other non-quantifiable issues here of irreparable harm, such as price erosion and reputational harm, and the district court found that with respect to price erosion, that SmartSky's arguments were merely conclusory and submitted no economic analysis, and that's a clear factual error. Mr. Stone, SmartSky's president, in his deposition, noted eight different customers that have cited Gogo's 5G network as a reason why SmartSky needs to lower its price. That's direct evidence of price erosion. Mr. Cook also provided analysis of price erosion at Appendix 302 and 303 and 8125 to 8127, explaining the price erosion. I thought there was something in the record that SmartSky set its prices for its system before Gogo came out with its 5G system and was really trying to underprice Gogo's 4G system. I see I'm running out of my rebuttal time. May I answer the question? So in the 4G system, the prior system you referenced, that there was included within that was this Advanced L5, and Mr. Stone explained that. So it's a necessary component of the 5G, and so it's all connected in that the 5G capability and the upgrade capability to 5G that's provided by this Advanced L5 component was a factor in the pricing. And so, again, Mr. Stone explained that multiple customers have pointed to the 5G option as a reason why SmartSky needs to lower its price in order to secure customers. Thank you very much. Thank you. I thank both the Council. The case is submitted. That concludes today's arguments.